# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE
NEWS RELEASE #024

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinion handed down on the **29th day of May, 2026** are as follows:

**BY Cole, J.:**

2025-CC-00971      VINTON HARBOR & TERMINAL DISTRICT VS. REUNION ENERGY COMPANY, ET AL. (Parish of Calcasieu) Affirmed in part; AFFIRMED IN PART, REVERSED IN PART, REMANDED. SEE OPINION.

Weimer, C.J., concurs in part and dissents in part and assigns reasons.

Hughes, J., concurs in part and dissents in part and assigns reasons.

Griffin, J., concurs in part and dissents in part for the reasons assigned by Justice Hughes.

Guidry, J., concurs in part and dissents in part for the reasons assigned by Justice Penzato.

Cole, J., additionally concurs and assigns reasons.

Penzato, J., concurs in part and dissents in part and assigns reasons.

# SUPREME COURT OF LOUISIANA

## No. 2025-CC-00971

## VINTON HARBOR & TERMINAL DISTRICT

## VS.

## REUNION ENERGY COMPANY, ET AL.

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Calcasieu

**COLE, J.**[*]

This case involves claims by plaintiff Vinton Harbor and Terminal District ("Vinton Harbor") against several defendants, including Honeywell International ("Honeywell") and Texas Pacific Oil Company, Inc. ("Texas Pacific") (together, "defendants"). Plaintiff claims Honeywell, Texas Pacific, and others caused damage to its property by conducting oil and gas exploration activities on the property subject to mineral leases. We granted the writ to examine whether Vinton Harbor has a right of action against Honeywell and Texas Pacific, or whether the claims are barred by an extension of the subsequent purchaser rule articulated in *Eagle Pipe and Supply, Inc. v. Amerada Hess Corp.*, 10-2267 (La. 10/25/11), 79 So. 3d 246, to mineral leases. Plaintiff argues we should overrule *Eagle Pipe* or decline to extend it to mineral leases. We disagree and now extend *Eagle Pipe* to mineral leases. For the following reasons, we affirm the court of appeal in part, reverse in part and remand for further proceedings.

---

[*] Judge Allison H. Penzato of the Court of Appeal, First Circuit, appointed as Justice pro tempore, sitting for the vacancy in the First District.

## BACKGROUND

Vinton Harbor, a political subdivision of the State of Louisiana in Calcasieu Parish, owns multiple tracts of land on which oil and gas exploration and production activities have occurred since the 1930s. The dispute here concerns certain tracts that Vinton Harbor acquired from Cleon Land Development, Inc. ("Cleon Land") on July 23, 1968; July 24, 1976; July 19, 1977; and July 30, 1987. Each conveyance was subject to Cleon Land's reservation of mineral rights.

Years before Vinton Harbor purchased the tracts, Cleon Land executed a mineral lease on November 1, 1943, in favor of Union Sulphur Company, Inc. ("Union Sulphur"). The lease granted the lessee broad rights to enter and use the surface for exploration, production, and related activities and included a clause making the lessee responsible for "all damages to timber and growing crops of Lessor caused by Lessee's operations." The lease further provided that its provisions would bind successors and assigns and that changes in land ownership would not impose additional burdens on the mineral lessee.

The lease history, which is apparently undisputed, is central to this case. As background, defendant Honeywell is the successor-in-interest of Union Sulphur, Union Oil & Gas Corporation of Louisiana ("Union Oil"), and Allied Chemical Corporation. Defendant Texas Pacific is the successor-in-interest of Frankfort Oil Company, which was acquired by Joseph E. Seagram & Sons, Inc. ("Seagram") in 1957 and later renamed Texas Pacific Oil Company. Texas Pacific acquired the assets of Seagram's oil division in 1969.

In 1957, Union Oil executed a partial release in favor of Cleon Land, retaining rights over a 100-acre tract that included portions of the tracts that Vinton Harbor later acquired. Thereafter, on November 1, 1960, Union Texas Natural Gas Corporation, which had resulted from a merger involving Union Oil, assigned its rights in the lease to Anderson-Pritchard Oil Corporation ("Anderson Pritchard").

2

That same day, Anderson-Pritchard assigned its rights to Seagram. Then, on October 18, 1968, Seagram assigned its rights to American Well Service and Salvage, Inc. The lease history indicates that various interests in the lease were assigned dozens of additional times before July 1, 2019. In 2020, the lease terminated by its own terms 90 days after the cessation of operations.

As to Honeywell, it is undisputed that before Vinton Harbor acquired any property from Cleon Land, Honeywell's predecessor chain had released or assigned away all its lease interests. However, because Vinton Harbor acquired one tract on July 23, 1968, there is an 87-day "overlap period" where Texas Pacific's predecessor Seagram held the lease simultaneous with Vinton Harbor before Seagram's October 18, 1968, assignment of the lease.[1]

Vinton Harbor filed this lawsuit in 2023, alleging tort and breach of contract claims for damages allegedly caused to its property by oil and gas activities dating back to the 1930s. Vinton Harbor named 13 defendants alleged either to have conducted operations on the property or to be successors-in-interest of entities that conducted such operations, including Honeywell and Texas Pacific. Defendants filed multiple exceptions, including exceptions of no right of action based on the subsequent purchaser rule set forth in *Eagle Pipe and Supply, Inc. v. Amerada Hess Corp.*, 10-2267 (La. 10/25/11), 79 So. 3d 246. The trial court denied the exceptions.

On supervisory review, the court of appeal reversed, finding the subsequent purchaser rule barred Vinton Harbor's claims for preacquisition damages. It issued two companion decisions addressing applications from Honeywell and Texas Pacific. As to Honeywell, the court concluded that any alleged damage attributable to Honeywell's predecessor operations predated Vinton Harbor's acquisition of the

---

[1] The parties describe the timing of oil and gas operations somewhat differently. Texas Pacific describes its predecessors' exploration and production activity as occurring "between 1960 and 1968," and Vinton Harbor describes it as "between 1961 and 1971." In any event, the lease record reflects that Seagram acquired the lease on November 1, 1960, and assigned it on October 18, 1968.

subject property and dismissed the claims against Honeywell with prejudice. *Vinton Harbor & Terminal Dist. v. Reunion Energy Co.*, 25-63 (La. App. 3 Cir. 7/2/25), 417 So. 3d 1028. As to Texas Pacific, the court likewise barred recovery for preacquisition damage but held Vinton Harbor had a right of action under La. Civ. Code art. 2315 for any damage caused during the 87-day period in 1968 when Vinton Harbor owned the tract and Texas Pacific's predecessor held coexisting mineral rights. *Vinton Harbor & Terminal Dist. v. Reunion Energy Co.*, 25-64 (La. App. 3 Cir. 7/2/25), 416 So. 3d 852.

This Court thereafter granted Vinton Harbor's writ application related to both Honeywell and Texas Pacific. 25-0971 (La. 11/25/25), 423 So. 3d 75.

## ANALYSIS

As a general principle, a legal action can be brought only by a person having a real and actual interest in doing so. La. C.C.P. art. 681. When the facts alleged in the petition provide a remedy under the law to someone, but the plaintiff who seeks the relief is not the person in whose favor the law extends the remedy, the proper objection is no right of action. *Caldwell v. Molina Healthcare, Inc.,* 18-1768, pp. 5-6 (La. 5/8/19), 283 So. 3d 472, 477. This objection of no right of action is raised by a peremptory exception of no right of action, the function of which is to have the plaintiff's action declared legally nonexistent, or barred by effect of law, and hence this exception dismisses or defeats the action. *Id. See also* La. C.C.P. arts. 923, 927.

The burden of showing that the plaintiff has no right of action is on the exceptor. *Caldwell,* 18-1768, p.6, 283 So. 3d at 477. If evidence is adduced at a hearing on a peremptory exception, the trial court's findings of fact are subject to the manifest error-clearly wrong standard of review, but other determinations are questions of law subject to de novo review. *Id.* An appellate court considering an exception of no right of action should focus on whether the plaintiff has a right to bring the suit and is a member of the class of persons that has a legal interest in the

4

subject matter of the litigation, assuming the petition states a valid cause of action for some person. *Id.,* 18-1768, p.7, 283 So. 3d at 477. This Court has long held that "[i]f doubt exists regarding the appropriateness of an objection of no right of action, it is to be resolved in favor of the plaintiff." *Id.*

**The Subsequent Purchaser Rule**

The subsequent purchaser rule, which derives from civilian principles of property and obligations, provides that an owner of property has "no right or actual interest in recovering from a third party for damage which was inflicted on the property before his purchase, in the absence of an assignment or subrogation of the rights belonging to the owner of the property when the damage was inflicted." *Eagle Pipe*, 10-2267, p.8, 79 So. 3d at 256-57.

*Eagle Pipe* involved a suit by landowners against oil trucking company defendants for damages that occurred before the landowners acquired the property, which allegedly arose from soil contamination related to a surface lease for operation of a pipe yard or pipe cleaning facility. *Eagle Pipe*, 10-2267, p.3, 79 So. 3d at 253. This Court conducted an extensive review of Louisiana property and obligations law and remarked that the subsequent purchaser rule derives from fundamental legal principles, as well as over 150 years of consistently applied jurisprudence. *Id.*, 10-2267, pp.8-43, 79 So. 3d at 256-277.

The Court concluded that damage to the property constitutes damage to a property owner's right of enjoyment in that property, which is a right of ownership and, consequently, a real right in the property. *Id.*, 10-2267, pp.37-38, 79 So. 3d at 275. As a result, "[t]he property owner ***at the time the damages were inflicted*** has a personal right of action against the tortfeasor for the disturbance of his real right in the property." *Id*. (emphasis added). A subsequent property owner has no right to sue the tortfeasor for preacquisition property damage, absent an assignment or subrogation of the prior owner's personal right to sue for damages. *Id.* Despite

5

having no right to sue for preacquisition damages, the subsequent purchaser does retain other rights, including the right to seek rescission of the sale or reduction in the purchase price. *Id.*[2]

Vinton Harbor contends that *Eagle Pipe* is inapplicable here because mineral leases differ from surface leases. *See Eagle Pipe*, 10-2267, p.48 n.80, 79 So. 3d at 281 n.80 (reserving fact situations "involving mineral leases or obligations arising out of the Mineral Code"). Specifically, Vinton Harbor contends the 1943 mineral lease conveyed a real right that runs with the land pursuant to Mineral Code article 16, La. R.S. 31:16, making it distinct from *Eagle Pipe*. Defendants respond that any claim for preacquisition damage is barred by subsequent purchaser principles, because a surface owner's right to recover for damage does not attach to the property absent assignment or subrogation.

Although *Eagle Pipe* reserved decision on mineral leases, the subsequent purchaser rule centers on the civilian distinction between real and personal rights—*i.e.*, the nature of the right asserted. Here, as in *Eagle Pipe*, the asserted right is an accrued claim for preacquisition physical property damage, which remains personal to the owner at the time of injury absent assignment.

Vinton Harbor's reliance on La. R.S. 31:16 does not alter that analysis. The article states: "Mineral rights are real rights and are subject either to the prescription of nonuse for ten years or to special rules of law governing the term of their

---

[2] At the "very core" of the subsequent purchaser rule is "the distinction between real and personal rights." *Eagle Pipe*, 10-2267, p.43, 79 So. 3d at 279. A real right "can be understood as ownership and its dismemberments," of which servitudes, both personal and predial, are types. *Id.*, 10-2267, pp.11-12, 79 So. 3d at 258-59. La. Civ. Code arts. 476, 533. Real rights and their correlative real obligations attach to a particular thing and are transferred with it without the need for an assignment. *Eagle Pipe*, 10-2267, p.17, 79 So. 3d at 262. A personal right, on the other hand, is one "that a person has against another person to demand performance of an obligation." *Id.*, 10-2267, p.16, 70 So. 3d at 261-62; *accord* 2 A.N. Yiannopoulos, La. Civ. Law Treatise: Property § 9:1 (5th ed. 2015). If a landowner sells his property, this personal right to sue for damages remains with him and is not transferred to the purchaser unless assigned. *Eagle Pipe*, 10-2267, pp. 37-38, 79 So. 3d at 275-76. In other words, absent an assignment of this personal right, a purchaser cannot sue for damage that occurred before the sale. *Id.*, 10-2267, p.38, 79 So. 3d at 279. *See also* 5 Litvinoff & Scalise, La. Civ. Law Treatise: Obligations, § 3.11 (2d ed. Nov. 2025).

existence." Like all other leases, mineral leases were initially classified as personal rights. *Gulf Refin. Co. of La. v. Glassell*, 171 So. 846, 849 (La. 1936). But that classification left mineral lessees without an effective remedy against the lessor when the land was transferred, prompting the legislature to recognize a real right "of the lessee" in order for the lessee to protect and enforce its interest despite ownership changes. Paul M. Hebert & Carlos E. Lazarus, *The Louisiana Legislation of 1938*, 1 La. L. Rev. 80, 101-102 (1938). *See also* 5 Litvinoff & Scalise, La. Civ. Law Treatise: Obligations, § 3.25 (2d ed. Nov. 2025) (to provide mineral lessees with effective remedies to protect their right to explore for minerals, the legislature "deemed it prudent to recognize by special legislation that a real right arises ***for the lessee***") (emphasis added) (citing La. R.S. 31:16). Thus, to the extent that a mineral lease is classified as a real right, that classification principally operates in favor of the lessee. Conversely, the real obligation in a mineral lease is the burden placed on the property owner to not interfere with the mineral right, including permitting the lessee to enter the property and conduct exploration activities. *See generally* 5 Litvinoff & Scalise, *supra*, § 3.1 ("A real obligation may [] be readily distinguished from a *personal* one. In the former the obligor is bound, regardless of his will, because he is the owner or possessor of a thing ***burdened with a real right*** . . . .") (emphasis added). Accordingly, the real right classification protects the lessee's ability to exercise and enforce its exploration rights and binds subsequent owners not to interfere with those rights, but it does not create a transferable right in later surface purchasers to recover for past damage.

This conclusion is consistent with Mineral Code comments that describe the mineral lease as hybrid in character. The lease "creates a real right in the ***hands of the lessee***," yet remains an "elaborate contractual relationship." La. R.S. 31:154,

cmt. (emphasis added).[3] Even accepting a mineral lease's real right effects for certain purposes, the question presented in this case is who owns the right of action for preacquisition injury to property. As set forth in detail in *Eagle Pipe*, Louisiana law treats that right to sue for damages as personal to the owner at the time the damage was inflicted. Unless the purchaser receives an express assignment or subrogation of the prior owner's accrued claim, of which there is no allegation or evidence in this case, the subsequent purchaser rule bars Vinton Harbor from recovering from these defendants for preacquisition damages, with the exception for the overlap period set forth *infra*.[4] Although this case involves a mineral lease and not a surface lease, the same "core" principles of Louisiana property and obligations law apply here as applied in *Eagle Pipe*.[5]

Vinton Harbor alternatively characterizes the alleged contamination and oilfield remnants as a continuing condition affecting the property today and asserts this suit is necessary to restore use and enjoyment and avoid shifting remediation costs to the public. That reframing does not alter the right of action inquiry. Here, the petition seeks to hold defendants responsible for property damage allegedly inflicted through historic operations predating Vinton Harbor's acquisition of the tracts. As explained, *Eagle Pipe* makes clear that, absent an assignment or subrogation, a subsequent purchaser may not recover from a third party for such

---

[3] Other provisions of the Mineral Code support the position that the real right created by a mineral lease is held by the lessee. Each one of the "major characteristics of a real right" that the mineral lease exhibits is held by the mineral lessee: "the mineral lessee may follow the land," "the mineral lessee may assert his rights against the world," "he [the mineral lessee] may enjoy directly and draw from the land a part of its economic advantages," "he [the mineral lessee] has certain rights of preference," and "he [the mineral lessee] holds a right that is in reality susceptible of a type of possession." La. R.S. 31:16 cmt.

[4] Vinton Harbor does not identify any lease provision conferring on later surface purchasers a right to enforce the 1943 lease against these defendants. The lease provision cited in the record obligates the lessee for damages to the "timber and growing crops of Lessor," and no party has identified language extending that clause, or any separate restoration clause, to subsequent surface purchasers absent assignment.

[5] In making this decision, we are cognizant of the fact that a "clear consensus" has emerged in the Louisiana state and federal courts that have considered this issue after *Eagle Pipe*. They have uniformly held that the subsequent purchaser doctrine applies in "cases involving mineral leases." *Guilbeau v. Hess Corp.*, 854 F.3d 310, 313-15 (5th Cir. 2017) (collecting cases).

preacquisition property damage. It likewise rejects attempts to recast defendants' completed historical conduct as a "continuing tort" where the petition alleges no "overt, persistent, and ongoing acts," and the complaint is merely "the continuing ill effect from the original tortious acts." *Eagle Pipe*, 10-2267, pp.45-46, 79 So. 3d at 280-81 (quoting *Hogg v. Chevron USA, Inc.*, 09-2632, p.21 (La. 7/6/10), 45 So. 3d 991, 1005 ("Where the wrongful conduct was completed, but the plaintiff continued to experience injury in the absence of any further activity by the tortfeasor, no continuing tort was found.")). Reframing the requested relief as "restoration," "removal," or "perfect enjoyment" does not convert that accrued personal claim into a real right running with title. *See Eagle Pipe*, 10-2267, 79 So. 3d at 289 (Guidry, J., concurring) ("[T]he property was contaminated during the period the sellers owned it. As such, the sellers, and not Eagle Pipe, would have possessed any personal right of action in tort against these defendants.").[6]

Vinton Harbor also contends that, even if the subsequent purchaser rule bars tort and contract claims for preacquisition damage, statutory and codal duties— particularly Mineral Code art. 11's "reasonable regard" requirement and the neighbor principles reflected in Civil Code art. 667—supply an independent basis for a right of action. That argument is unpersuasive and not supported by any statutory duty or jurisprudence. Mineral Code article 11 provides that "[t]he owner of land burdened by a mineral right or rights and the owner of a mineral right must exercise their respective rights with reasonable regard for those of the other." La.

---

[6] Vinton Harbor makes several additional arguments that it asserts alter the subsequent purchaser rule analysis, most of which are unavailing. Vinton Harbor asserts its right of action is supported by the final sentence of Civil Code article 1764, comment (f), which states that the "obligation to demolish works and to restore the premises to their previous condition is a real obligation, following the immovable into the hands of any acquirer." But the sentence immediately preceding that sentence, within the same comment, confirms that indemnity for damage to immovable property "does not pass with the immovable unless assigned," underscoring that the right to recover for preacquisition damage remains personal absent assignment. Moreover, *Eagle Pipe* considered and rejected this type of remedy relabeling. This comment does not supply Vinton Harbor with an exception to the subsequent purchaser rule.

R.S. 31:11(A). *See generally Caskey v. Kelly Oil Co.*, 98-1193, pp.14-15 (La. 6/29/99), 737 So. 2d 1257, 1265 (describing the reasonable regard standard). Civil Code article 667 likewise addresses liability for damage caused a proprietor's "works" on his estate that "deprives his neighbor of enjoyment or causes damage to him." *See Inabnet v. Exxon Corp.*, 93-0681 (La. 9/6/94), 642 So. 2d 1243, 1250-51 (citing 4 A.N. Yiannopoulos, La. Civ. Law Treatise: Predial Servitudes §§ 25, 33 (1983)). Even assuming these provisions may support liability in a different case, they regulate the contemporaneous exercise of coexisting rights and do not supply a transferable right of action for preacquisition injury. Other than the brief overlap period addressed *infra*, the conduct attributed to these defendants predates Vinton Harbor's acquisition by decades. Because Vinton Harbor did not hold coexisting rights contemporaneously with Honeywell's predecessors, and because its claims otherwise seek recovery for preacquisition injury without assignment, Articles 11 and 667 do not supply Vinton Harbor a right of action for the preacquisition damages alleged here. La. R.S. 31:11; La. Civ. Code art. 667.

*Eagle Pipe* grounded the subsequent purchaser rule in Louisiana property and obligations law and found that the right to recover for preacquisition property damage is personal and nontransferable absent assignment. Nothing in the Mineral Code alters that principle for claims asserted by a subsequent surface purchaser against prior mineral lessees. We therefore extend the subsequent purchaser rule principles set forth in *Eagle Pipe* to mineral leases.

**The Reserved Claim**

We next address the "overlap period," which is the 87-day interval during which Vinton Harbor owned tract 4 while Texas Pacific's predecessor, Seagram, simultaneously held rights in the same tract under the mineral lease. The court of appeal correctly treated the overlap period claim as analytically distinct from Vinton Harbor's primary claims for preacquisition damage. The subsequent purchaser rule

concerns whether a purchaser possesses a right of action for damage inflicted before its acquisition of the property only. It does not bar a property owner from pursuing a right of action for damage allegedly inflicted during its ownership. Rather, under general delictual principles of La. Civ. Code art. 2315, a property owner has a personal right of action for property damage sustained during its ownership, including against a party that simultaneously held rights in the property at the time of the alleged damage.

The lease record here reflects such a brief period of coexisting rights. Vinton Harbor acquired tract 4 on July 23, 1968, and Texas Pacific's predecessor Seagram's rights did not terminate until October 18, 1968. Accordingly, Texas Pacific's exception of no right of action is denied, but only insofar as Vinton Harbor seeks recovery for damage allegedly inflicted during that 1968 overlap period.

**The Mineral Code's Prudent Operator Standard**

Although *Eagle Pipe* bars recovery for preacquisition damage absent assignment, Vinton Harbor separately invokes the Mineral Code's prudent-operator duty as a basis for limited termination-time relief. Where a mineral lease contains an express provision directed to and distinctly governing restoration, remediation, or other end-of-lease duties, the parties' rights and obligations are governed first by their contract. In the absence of an express contractual provision, and distinct from the delictual claims which remain subject to the subsequent purchaser rule, our Mineral Code clearly imposes performance duties as implied lease obligations upon all lessees measured by the requirement to act as a prudent operator. For purposes of this case, this discussion addresses only duties enforceable at cessation or termination, not claims for operational damage occurring during the lease term.

Article 122 of the Mineral Code imposes an affirmative performance duty on a mineral lessee and provides the standard by which that duty is judged: the lessee must perform in "good faith" and "develop and operate the property leased as a

reasonably prudent operator for the mutual benefit of himself and his lessor." La. R.S. 31:122. This Court has long treated the prudent operator requirement as an enforceable obligation, explaining that in addition to duties associated with production and development, where a lessee has operated unreasonably or excessively, it has "additional obligations," including the obligation to correct damage attributable to that unreasonable or excessive conduct. *See, e.g., Marin v. Exxon Mobil Corp.*, 09-2368, p.38 (La. 10/19/10), 48 So. 3d 234, 260. Because the lessee retains the contractual right to use the land during the lease, demands for end-of-lease removal or restoration obligations are typically premature while the lease is extant and ordinarily become ripe only upon cessation or termination, when the lessee's rights end and the end-of-lease obligations, if any, becomes due. *Terrebonne Parish School Bd. v. Castex Energy, Inc.*, 04-0968, p.11 (La. 1/9/05), 893 So. 2d 789, 797. *See also Dore Energy Corp. v. Carter-Langham Inc.*, 04-1373 (La. App. 3 Cir. 5/4/05), 901 So. 2d 1238 (recognizing that Mineral Code article 122 claims for restoration-type relief are premature while the leasehold use continues).

This Court has rejected the notion that article 122 guarantees a restoration mandate in every case where the surface was altered. *See, e.g., Castex*, 04-0968, p.11, 893 So. 2d at 797. Absent a broader contractual lease provision, a restoration obligation is triggered only upon proof that the lessee exercised its rights under the lease unreasonably or excessively. *Id.*, 04-0968, p.2, 893 So. 2d at 792. *See also State v. Louisiana Land & Expl. Co.*, 12-0884, p.12 (La. 1/30/13), 110 So. 3d 1038, 1047.

Consistent with these decisions, if unreasonable or excessive operations are proven, any remaining end-of-lease obligations under the prudent operator standard extend only to remedying the consequences of that conduct, not restoring the land to its pre-lease condition. *Marin*, 09-2368, p.38, 48 So. 3d at 260. As we recognized in *Marin,* actions limited solely to the normal "wear and tear" of mineral lease

12

operations do not give rise to an implied obligation of restoration. *Id.*, 09-2368, p.38, 48 So. 3d at 260.[7]

This case presents in the posture of a peremptory exception. The scope of a lessee's corrective obligations under Mineral Code article 122 is a question of fact that depends on relevant proof of violations of the prudent operator rule. *See e.g. Castex*, 04-0968, p. 11, 893 So. 2d at 797 ("The duty to restore is limited by an economic balancing process, . . . according to which a court must apply a standard of reasonableness and balance the cost of perfect restoration against the value of the use to which the land is being put.") (quoting La. R.S. 31:122, cmt.) (internal quotations and brackets omitted). In the first instance, the standard is determined by any express terms of the lease itself. *See id.*, 04-0968, p. 16, 893 So. 2d at 800 (where the lease granted the right to dredge canals, this was sufficient consent for changes "necessarily incident to dredging" and restoration obligations did not include filling those canals). This implied obligation does not extend a restoration duty to damage from acts "ordinary, customary, and necessary" to the lessee's mineral operations, absent unreasonable or excessive use. *Id.*, 04-0968, p. 9, 893 So. 2d at 796.

In summary, framed through article 122's prudent operator standard, Vinton Harbor's right of action does not depend on inheriting a preacquisition claim barred by the subsequent purchaser rule. Instead, the alleged breach is a codally imposed ***termination-time omission***, *i.e.*, the lessee's failure to take those reasonable measures required of a prudent operator at the time of cessation or termination. This is therefore distinct from liability for historic operational damage predating plaintiff's ownership, and it does not arise merely because a preexisting condition remains present after acquisition. The fundamental question is whether, after considering these limitations to the scope of the obligation, a prudent operator at the

---

[7] We do not reach here any issues related to any implied obligations that may apply under the Louisiana Civil Code.

13

cessation of operations should have removed the offending property or remedied the alleged harm.

Having determined that La. R.S. 31:122 supplies the prudent operator standard for the end-of-lease obligations asserted here, another question is whether Vinton Harbor, as surface owner at lease termination, may seek relief under that standard. Vinton Harbor acquired the tracts while the 1943 mineral lease remained recorded and in force. Under La. R.S. 9:2721(B), one who acquires immovable property subject to a recorded lease takes the property "subject to all of the provisions of the lease." We interpret this principle to operate prospectively; it does not, without an express assignment, transfer a prior owner's preacquisition damage claims. *Eagle Pipe*, 10-2267, pp.37-38, 79 So. 3d at 275. For this narrow issue, however, we must identify the party who may demand performance of duties that are, by their nature, enforceable only at cessation or termination of a lease and relating to the reasonableness of cessation obligations arising at that time. In *Ashby v. IMC Exploration Co.*, 506 So. 2d 1193 (La. 1987), this Court found that subsequent recorded surface owners may rely on the public records to delineate their rights with respect to the mineral lessee and that enforcement of an obligation depends on whether it was strictly personal to the original lessor.[8]

Accordingly, for the limited purpose of enforcing Mineral Code performance duties that mature only upon cessation or termination of a mineral lease, we recognize Vinton Harbor as having a right of action to assert termination-time claims based solely on unreasonable and excessive operations under La. R.S. 31:122.[9] Any

---

[8] The analysis may be different where the final surface holder was at least a partial owner of mineral rights and may therefore be able to assert different obligations as to co-owners. Because the record in this case is internally contradictory, we do not reach that issue here. Vinton Harbor states in brief that it "never owned the mineral rights to the property." However, in briefing below, Vinton Harbor states that it "did obtain 50% of the mineral rights on the tract acquired from Jardell and is therefore entitled to enforce the end of lease obligations." R. Vol. 1, p.172. Due to this internal conflict, we do not address this issue.

[9] The fact that the Mineral Code was not adopted at the time in question does not change our analysis, since the prudent operator obligation was merely codified from prior law that was in

14

other interpretation is inconsistent with the law since it leaves performance duties that do not mature and become cognizable until lease cessation or termination without any enforcement mechanism when surface ownership has changed over time. *La. Mun. Ass'n v. State*, 04-0227, p.36 (La. 1/19/05), 893 So. 2d 809, 837 ("Courts are bound to give effect to all parts of a statute and cannot give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided."). We do not address, and do not recognize here, any general right in subsequent surface owners to enforce mid-lease performance obligations under La. R.S. 31:122.

Having resolved the question presented and found (i) no general right of action for Vinton Harbor under the subsequent purchaser rule; and (ii) a limited right of action for Vinton Harbor related to termination-time obligations that do not mature until lease end under the prudent operator standard, the final question is whether Honeywell and Texas Pacific may be considered proper defendants. In answering this question, we are constrained to follow the text of the Mineral Code as enacted by our legislature. It expressly provides that when any mineral lease has been assigned by one lessee to another, the predecessor in title (assignor) is ***"not relieved of his obligations or liabilities under a mineral lease unless the lessor has discharged him expressly and in writing***." La. R.S. 31:129 (emphasis added). *See e.g., Rainbow Gun Club, Inc. v. Denbury Res., Inc.*, 17-0997, p.5 (La. App. 3 Cir. 5/23/18), 247 So. 3d 844, 848 ("[U]nless expressly discharged in writing by the

---

effect as recognized in jurisprudence and the code comments. *See*, *e.g.*, *Wemple v. Pasadena Petroleum Co.*, 85 So. 230, 231 (1920) (exercise of companies' rights "had, of course, to be as a 'good administrator' (C.C. art. 2710)"); *See e.g. Castex*, 04-0968, p.10, 893 So. 2d at 797 (noting that article 122 "simply adapts the general 'good administrator' standard" of the Civil Code). *See also* La. R.S. 31:122 (cmt.) ("In Louisiana there is available in the Civil Code a general principle which can serve as a basis for achieving the result of the doctrine of implied covenants in other jurisdictions. Article 2710 requires that a lessee enjoy the thing leased as 'a good administrator.' This objective standard can aptly be translated into the field of mineral law as the 'reasonable, prudent operator' standard which has been consistently applied by Louisiana courts to oil, gas, and mineral leases.").

lessor, the original lessee, along with all future assignees or sublessees, become solidarily liable to the lessor for the whole performance of the lessee's obligations imposed by the mineral lease."). In the present case, this Court has located no record evidence that either of these defendants were released by Vinton Harbor or by any lessors as its relevant predecessors in title. One question on remand is therefore whether these defendants were released from their lease obligations by their lessor(s) as expressly required by law. La. R.S. 31:128, 31:129. Further, the comment to article 129 adeptly summarizes that an assignor's retained liability for lease compliance existed under Louisiana law going back to the 1800s, even if only codified later into the Mineral Code.[10]

## CONCLUSION

We reaffirm and extend the subsequent purchaser rule articulated in *Eagle Pipe*: when property damage is alleged to have been inflicted before the plaintiff acquired title, the right to recover for that injury is a personal right that vests in the owner whose real rights were disturbed at the time of injury and does not pass with the immovable absent an express assignment or subrogation. Consistent with *Eagle Pipe*, Vinton Harbor's attempts to reframe historic operational damage as a "continuing condition" do not alter the right-of-action analysis where the alleged

---

[10] *See* La. R.S. 31:129, cmt:

> The original lease is unaffected by the sublease. It was implicit in such cases as *Broussard v. Hassie Hunt Trust*, 231 La. 474, 91 So.2d 762 (1956), that if under prior law the lessor could not demand performance from a sublessee, his right to demand fulfillment of the obligations of the original lease against his lessee remained….it is the intent of this article to retain the concept that the prime lessor can continue to demand performance from his lessee unless he has released him in writing. It is also true of present law that an assignor cannot free himself of the obligations of his contract by assignment without consent of his creditor. The substitution of a new debtor is a form of novation, but it is effective only with the consent of the creditor. La. Civil Code arts. 2189-90 [see, now, C.C. arts. 1880, 1881, 1882, 1900] (1870). Also, as provided by Civil Code art. 2190 [see, now, C.C. art. 1900], the intention to make a novation must "clearly result from the terms of the agreement." The substitution of a new lessee has been held to be a form of novation in the case of an ordinary lease. *Vignie v. Gouaux*, 14 La. Ann. 344 (1859). There is no basis for distinguishing mineral leases from other types of leases in this respect.

16

wrongful conduct has ended and the complaint is directed at the continuing effects of completed acts.

At the same time, this holding does not leave a subsequent purchaser without redress. *Eagle Pipe* recognizes the purchaser's traditional contractual remedies (including rescission or reduction of price where applicable), and it also recognizes that the Legislature has provided a statutory mechanism aimed at remediation and returning property to use and commerce. There are also remedies for tort damages that occurred during any period of actual ownership—here, during the overlap period.

Against that backdrop, and only in the context addressed in this opinion, we recognize that our law also grants Vinton Harbor the ability to invoke the prudent-operator standard of La. R.S. 31:122 for termination-time nonperformance enforceable only upon the cessation or termination of the lease. The scope of that obligation remains a fact question to be determined in accordance with the principles expressed herein.[11]

The decision of the court of appeal is affirmed in part and reversed in part. The matter is remanded to the trial court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, REMANDED.**

---

[11] The Court observes that all claims subject to the provisions of La. R.S. 30:29 are statutorily barred unless filed prior to September 1, 2027.

# SUPREME COURT OF LOUISIANA

## No. 2025-CC-00971

## VINTON HARBOR & TERMINAL DISTRICT

## VS.

## REUNION ENERGY COMPANY, ET AL.

*On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Calcasieu*

**WEIMER, C.J.**, concurring in part and dissenting in part.

I agree, in general, with the majority that the subsequent purchaser rule expressed in **Eagle Pipe & Supply, Inc. v. Amerada Hess Corp**., 10-2267 (La. 10/25/11), 79 So.3d 246, can be applied in cases involving mineral leases. Consistent with my dissent in **Eagle Pipe**, I disagree with the creation of a "bright line rule expanding the application of the jurisprudentially created subsequent purchaser rule to all circumstances, regardless of the facts." See **Eagle Pipe**, 10-2267 at 1, 79 So.3d at 284 (Weimer, J., dissenting). In sum, I dissent because the subsequent purchaser rule should not be applied in cases where the property damage was hidden or non-apparent at the time of the sale of the property. In the context of tortious injury to property, the relevant "injury" is the loss of use and resulting loss of value of the property. In the case of hidden damage, which is unknown to either seller or purchaser at the time of a sale, the only landowner who sustains an interference with his use of the property, and incurs a loss of property value, is the owner of the property at the time the hidden damage is discovered. *Id.*, 10-2267 at 7, 79 So.3d at 287 (Weimer, J., dissenting). The landowner at the time of the tortious conduct has not suffered an injury. *Id.*, 10-2267 at 6, 79 So.3d at 287 (Weimer, J., dissenting).

In this case, Vinton Harbor acquired the tracts of property in 1968, 1976, 1977,

1

and 1987. Vinton Harbor alleges in its petition that defendants "chose to conceal and cover up their contamination," and that it "did not have actual or constructive knowledge of the pollution ... until less than a year prior to filing of this suit." Vinton Harbor also alleges that defendants engaged in acts of fraud and misrepresentation including "burying, hiding or actively concealing pollution."[1] Because this case presents in the context of an exception of no right of action, there have been no factual findings regarding whether the damage to the property was apparent at the time the tracts were purchased by Vinton Harbor. Vinton Harbor's right of action should be maintained until such facts have been determined, and I therefore dissent from the majority's holding otherwise.[2]

---

[1] However, in brief, Vinton Harbor points out potentially apparent evidence of some contamination in the form of "orphaned wells, tank batteries, miles of flowlines, surface equipment, and large open waste pits" which remain on the property.

[2] I agree that Vinton Harbor has a right of action relative to damages inflicted on tract 4 during the 87-day period during which it owned that tract of property and Texas Pacific's predecessor operated on the property under the mineral lease. I would not address the issue of whether Vinton Harbor has a right of action under Mineral Code article 122 because no such relief has been sought from this court.

SUPREME COURT OF LOUISIANA

No. 2025-CC-00971

VINTON HARBOR & TERMINAL DISTRICT

VS.

REUNION ENERGY COMPANY, ET AL.

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Calcasieu

**Hughes, J., concurs in part and dissents in part.**

The sources of law are legislation and custom, Louisiana Civil Code article 1. Custom may not abrogate law, Louisiana Civil Code article 3. It is the duty of this court to apply the law as written.

La. R.S. 31:16, titled "Basic mineral rights; status as real rights" provides:

> The basic mineral rights that may be created by a landowner are the mineral servitude, the mineral royalty, and the mineral lease. This enumeration does not exclude the creation of other mineral rights by a landowner. Mineral rights are real rights and are subject either to the prescription of nonuse for ten years or to special rules of law governing the term of their existence.

The **Eagle Pipe** decision did not address mineral rights. In fact, in footnote 80, it specifically excluded mineral rights. There is no authority in law to apply the "subsequent purchaser" rule articulated with reference to a commercial lease in **Eagle Pipe** to mineral leases. **Eagle Pipe** addressed the personal rights and obligations that arise from a traditional commercial lease. Traditional civilian principles dating to the Code Napoleon and Pothier hold that these rights and obligations are personal. If a lessee of an apartment or a retail space or a storge unit should damage the leased property, there arises a personal obligation for the lessee to repair the damage. Likewise, any obligation owed by the lessor to the lessee is a personal obligation of the lessor.

In contrast, the Legislature has provided that mineral rights are real rights and thus run with the land. There is no distinction in the law between the rights and obligations of a mineral lessor and a mineral lessee. Learned commentators and the lower courts cannot change the law to provide that the rights and obligations of a mineral lessee are real rights that run with the land while the rights and obligations of a mineral lessor are personal rights. Civilian principles would hold such a schizophrenic result as absurd.

While it is conceivable the Legislature could legislate such a result, it has not. The law, as written by the Legislature, does not differentiate between a landowner and a lessee. It merely provides that "mineral rights are real rights." These rights and accompanying obligations should apply equally. The rights of a mineral lessee can be conveyed countless times and a subsequent lessee maintains the right to enjoy the benefits of the original lease. Likewise, if a lessee damages the property, the rights of the lessor would "run with the land." The real obligation to make repairs would be satisfied when the repairs are made.

I therefore respectfully dissent from the attempt to apply the personal rights and obligations that arise from a common commercial lease to mineral rights, given the specific pronouncement by the Legislature that "mineral rights are real rights." Such a jurisprudentially produced change in the law is contrary to civilian principles and flies in the face of the law as enacted by the Legislature. I respectfully concur with the remainder of the opinion.

SUPREME COURT OF LOUISIANA

No. 2025-CC-00971

VINTON HARBOR & TERMINAL DISTRICT

VS.

REUNION ENERGY COMPANY, ET AL.

On Writ of Certiorari to the Court of Appeal, Third Circuit,
Parish of Calcasieu

**Cole, J.,** additionally concurring

There are five separate votes concurring in part and dissenting in part from the Court's opinion. While the justices did not align identically on every issue, a majority supports the judgment, and different justices joined different parts of the opinion. Four justices joined the portion of the opinion upholding and extending *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 10-2267 (La. 10/25/11), 79 So. 3d 246 (for purposes of this concurrence, "Part I"). Three justices would overrule *Eagle Pipe* in whole or in part. Such an action, in my view, would inject unnecessary instability into an important area of the law.

The second part of the opinion ("Part II" for purposes of this concurrence), which addresses implied obligations, drew a different majority. Two justices who joined Part I would not reach that issue at this stage. At the same time, two justices who disagreed with Part I joined Part II. It is my view that this issue was properly addressed in this opinion, as it was pleaded by the plaintiff and the case comes before the Court on an exception of no right of action that did not attack the plaintiff's right to that pled cause of action.

I find the answer to Part II compelled by our statutory regime and that it was preferable to address prior to remand. That approach narrows the remaining disputes rather than leaving the parties to proceed through costly and protracted litigation while only guessing at the applicable standards. On remand, plaintiff will bear the burden of producing evidence sufficient to prove that aspect of its case.

# SUPREME COURT OF LOUISIANA

## No. 2025-CC-00971

## VINTON HARBOR & TERMINAL DISTRICT

## VS.

## REUNION ENERGY COMPANY, ET AL.

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Calcasieu

**PENZATO, Justice Pro Tempore**, concurring in part and dissenting in part.

This Court granted the writ to examine whether Vinton Harbor's claims against Honeywell and Texas Pacific are barred by the subsequent purchaser rule articulated in *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 10-2267 (La. 10/25/11), 79 So. 3d 246. I agree with extending the subsequent purchaser rule to mineral leases and the majority's conclusion that the subsequent purchaser rule does not bar Vinton Harbor from pursuing a right of action against Texas Pacific for damage allegedly inflicted during the 87-day period of their coexisting rights. However, I would end the analysis there. Vinton Harbor has not requested relief from this Court on the basis that it has a right of action under Mineral Code article 122 and that issue was not briefed by the parties. I disagree with raising the issue *sua sponte* and recognizing Vinton Harbor has a right of action under Mineral Code article 122 based on legal conclusions asserted in its petition. *See Montalvo v. Sondes*, 637 So. 2d 127, 131 (La. 1984) ("The mere conclusion of the pleader unsupported by facts does not set forth a cause or right of action."). I further disagree with issuing what amounts to an advisory opinion on what evidence will establish whether Vinton Harbor does or does not have a cause of action under Mineral Code article 122 against these or any other defendants.

1

For these reasons, I dissent in part and would affirm the decision of the court of appeal in its entirety.